# EXHIBIT A

Suzette Rasmussen (15981)
**ALL UTAH LAW PLLC**
Michael K. Green (13989)
**GREEN LAW OFFICE PLLC**
136 W. 12300 S., Ste. B
Draper, UT 84020
Tel.: (801) 717-0821
suzette@allutahlaw.com
mike@mikegreenlegal.com

Alan W. Mortensen (6616)
Lance L. Milne (14879)
Christopher J. Cheney (15572)
Joshua S. Ostler (14277)
**MORTENSEN & MILNE**
68 South Main Street, Suite 700
Salt Lake City, UT 84101
Tel.: (801) 521-4444
amort@mortmilnelaw.com
lmilne@mortmilnelaw.com
ccheney@mortmilnelaw.com
jostler@mortmilnelaw.com
*Attorneys for Plaintiff*

> **If you do not respond to this document within applicable time limits, judgment could be entered against you as requested.**

## IN THE THIRD JUDICIAL DISTRICT COURT
## SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| JORDANA BREE RIGHTER, <br><br> Plaintiff, <br><br> v. <br><br> TIMOTHY BALLARD, an individual and as the ALTER-EGO of OPERATION UNDERGROUND RAILROAD, INC., a Utah non-profit corporation; and as the ALTER-EGO of DEACON, INC., a Nevada corporation; MATTHEW COOPER, an individual, | **COMPLAINT AND JURY DEMAND** <br><br> **(Tier 3)** <br><br> Civil No.: <br><br> Judge: |

1

|  Defendants. |  |
|---|---|

Plaintiff, by and through counsel, hereby complains against Defendants and alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff is a resident of the State of Virginia.

2. Defendant Timothy Ballard, aka Tim Ballard ("Ballard") is an adult citizen and resident of the State of Utah.

3. Defendant Operation Underground Railroad, Inc. ("OUR") is a Utah non-profit corporation.

4. Defendant Deacon, Inc., is a Nevada corporation.

5. Defendant Ballard is the alter-ego and face of the above-named corporate and company entities, which will be collectively referred to as "OUR" as Ballard wore many hats within the companies and no distinctions between the companies were made.

6. Matthew Cooper is a current or former employee of OUR and is an adult citizen and resident of the State of Utah.

7. This Court has jurisdiction pursuant to Utah Code § 78A-5-102.

8. Venue is proper pursuant to Utah Code § 78B-3-307.

9. Pursuant to Rule 26(c)(3) of the Utah Rules of Civil Procedure, the amount in controversy exceeds $300,000 qualifying this claim for Tier 3 discovery.

## FACTUAL ALLEGATIONS

10.     Timothy Ballard is an American activist, speaker, and author.

11.     Ballard claims to have worked for the Central Intelligence Agency (CIA) and as a special agent in the United States Department of Homeland Security.

12.     Ballard founded the non-profit organization Operation Underground Railroad ("OUR") in 2013 that claims to "lead the fight against human trafficking and sexual exploitation worldwide."

13.     Ballard led Deacon, Inc., and it too operates as the alter-ego of Tim Ballard.

14.     The corporate defendants were created by Ballard in order to funnel the donations coming into OUR into corporate profits and shareholder distributions.

15.     At all relevant points in time, Defendant Cooper was a principal and/or employee of OUR and had actual knowledge of Ballard's and/or OUR's misconduct.

16.     OUR raised money in order to have conducted multiple sting operations to purportedly rescue trafficked women and children ("OPS"), with OPS being conducted outside the United States.

17.     Many of these OPS included wealthy men with no military training, who wanted an "experience vacation" where they dropped into third-world countries to rescue trafficked children, with photo opportunities and stories in the local newspapers of their heroics, all the while flying first class.

18.     While promotional and media materials made the OPS appear to be paramilitary drop-ins to arrest traffickers and rescue children, what most OPS consisted of was going to strip

clubs and massage parlors across the world, after flying first class to get there, and staying at 5-star hotels, on boats, and at VRBOs across the globe.

19. These OPS were a fund-raising machine, though they were more show than substance, and the entire OUR enterprises were funded by donors for these OPS, many of whom held bake sales and literally donated their "widow's mite" to OUR and Tim Ballard.

20. Ballard became the de facto and most recognized face of anti-child trafficking, which everyone agrees is a most noble cause.

21. In order to find and save trafficked children, Ballard would receive psychic information from psychic Janet Russon about where the OPS should occur, along with reassurance and justification of everything Ballard did, while predicting the future situations the operatives would be in, so that they could plan the next OP.

22. Ms. Russon claims that she spoke to a dead person named Nephi, who directed her about where to locate the trafficked children.

23. Ballard used OUR and its OPS to fund his personal fantasies of grandeur.

24. Plaintiff is an honorably discharged Marine who had served her country faithfully, achieving the rank of Corporal.

25. Plaintiff wanted to help rescue trafficked children and was hired as an independent contractor to Defendant Operation Underground Railroad and Defendant Deacon to carry out OPS.

26. Ballard had begun a program for women accompanying him and others on OPS and called the program "THE COUPLES RUSE."

27. Ballard claims that the COUPLES RUSE was an undercover tool to prevent detection by pedophiles when Ballard would not engage in sexual touching of the trafficked

women offered up to him in strip clubs and massage parlors across the world.

28. OUR adopted the COUPLES RUSE as a corporate policy and procedure and promoted it and allowed Ballard free reign in implementing it.

29. Ballard claims that he implemented strict rules regarding the COUPLES RUSE: no kissing on the lips and no touching or exposing private parts.

30. Ballard soon began abusing the COUPLES RUSE and eventually used the ruse as a tool for sexual grooming.

31. As part of either an OP or practice for the OP, Ballard would often share a bed with a woman posing as his girlfriend or invite her to shower in his bathroom, even though accommodations at designated "safe houses" provided separate bedrooms and bathrooms.

32. Before they ever went undercover together, Ballard insisted that he first needed to ensure that he and his female counterparts in the COUPLES RUSE had physical "chemistry" that would be obvious to those they would meet during an operation.

33. Ballard encouraged female operatives to participate in tantric massages before and while on a COUPLES RUSE.

34. Ballard claimed to be so concerned about the believability of the COUPLES RUSE that he frequently asked women to "practice" their COUPLES RUSE long before a mission ever took place.

35. To that end, Ballard flew women across the country, where they would "practice" their sexual chemistry through tantric yoga, couples massages with escorts, and lap dancing on Ballard's lap.

36. Through these COUPLES RUSES, both in the office and in the field, Ballard

eventually engaged in coerced sexual contact with several women and propositioned others.

37. Ballard participated in several sexual acts with the exception of actual penetration, in various states of undress while on an OPS mission.

38. Ballard developed a sexual position where it appeared he was having full on sexual intercourse with his COUPLES RUSE victims, while not actually penetrating.

39. While inside private accommodations, when no one else was around that they needed to fool, Ballard would claim that he and his female partner had to maintain the appearance of a romantic relationship at all times in case suspicious traffickers might be surveilling them at any moment.

40. Ballard requested the women he invited to act as his significant other, to first have a Brazilian wax.

41. Ballard would ask each woman, "Is there anything you wouldn't do to save a child?"

42. To further convince the women of his need for them on the next OPS mission, Ballard would badmouth previous female partners, claiming that the women who had allegedly gone on COUPLES RUSES in the past were "crazy," and claiming that they had fallen in love with him along the way.

43. Ballard used these mythical stories to motivate the women in his COUPLES RUSE to prove their mettle and their devotion to the cause by trying to outdo their supposed predecessors.

44. When these women found themselves questioning the legitimacy of tactics involving sexual contact, they often doubted their own instincts, relying on Ballard's breadth of

knowledge about rescue missions to convince themselves that such tactics were normal.

45. Other employees of OUR would warn these women not to question Ballard or their lives would be put in danger.

46. Ballard would also tell the women that engaging in sex play with him would improve their marriage, even as he also told them not to tell their husbands about what they were doing (or it would compromise the mission, children, their lives, and other informants' lives).

47. Ballard would repeatedly warn these women that if they failed in their COUPLES RUSE mission, they would have wasted the hard-earned money that honest donors had entrusted to OUR, or be caught or killed by the cartel.

48. Ballard would also tell these women that Janet Russon and/or Katherine (Tim Ballard's wife) had chosen them to be part of the COUPLES RUSE.

49. Ballard would use spiritual manipulation to coerce them into sexual contact.

50. OUR management adopted and accepted the COUPLES RUSE as a standard policy and procedure of the company and allowed Ballard unrestrained allowance on how he enacted the COUPLES RUSE.

51. Additionally, he required the women he asked to go on OPS as part of the COUPLES RUSE to sign Non-Disclosure Agreements (NDA), claiming it was required to protect the safety of the children and the participants.

52. Ballard would then threaten to sue the women if they ever disclosed anything about his tactics, practice OPS, or the COUPLES RUSE.

53. All of this was unbeknownst to the general public, which is where OUR obtained its donations and Ballard gained his credibility.

54. Plaintiff is an honorably discharged Marine who is also a licensed clinical social worker (LCSW) in Virginia.

55. OUR was seeking an LCSW in Virginia for purported aftercare of trafficked children.

56. When Plaintiff's background was made known to OUR, OUR asked her to come out to Utah to be trained as an operator.

57. Upon arrival in Utah, Ballard individually met with the Plaintiff and asked her "What are you willing to do to save children?"

58. Ballard also wanted to know if the Plaintiff was gay and became very excited when he learned that she was bi-sexual.

59. He then described the COUPLES RUSE and said she would go on an OP with Ballard and his COUPLES RUSE partner, with Plaintiff acting as Defendant Matt Cooper's sexual partner on an OP to the British Virgin Islands (outside the jurisdiction of the United States of America).

60. Before going to the British Virgin Islands, Plaintiff was required to go to a strip club in Salt Lake City so that she could prove herself to Tim Ballard and Matt Cooper, where she was sexually touched under false pretense.

61. Upon arrival to the British Virgin Islands, Ballard and his OPS team were provided a remote beach front home and a yacht where Ballard and his OPS team spent a week recreating under the guise of a COVID quarantine.

62. Ballard was there with his COUPLES RUSE partner and when as a surprise to Ballard, his wife Katherine showed up on the island.

63. Ballard ignored his COUPLES RUSE partner until Katherine left the island.

64. At that point in time, Ballard began a weeklong experience of partying, dragging his team to strip clubs all across the island, trying to create a demand for underage girls so that a pimp somewhere could find him one.









65. The undercover mission, or "fishing trip," was called "Operation Marcel," and had no clear or discernible purpose.

66. Ballard attempted to goad Defendant Cooper to be more sexually aggressive in the COUPLES RUSE with Plaintiff, which led to Plaintiff being sexually touched by Defendant Cooper under false pretense both at the lavish resort and while going to strip clubs and massage parlors in the British Virgin Islands.

67. Plaintiff was hopeful that she would learn about the exotic technology OUR used to identify and surveil traffickers, as well as about its policies and procedures.

68. However, as time on the island passed, she slowly realized that there was no training nor exotic technology.

69. After returning home, Plaintiff informed OUR that she would never participate with Ballard on OPS given his abhorrent behaviors, and that it was Ballard who created the demand on the island for trafficked children.

70. It was also evident that other top members of OUR besides Ballard were also participants in the COUPLES RUSE.

71. When Plaintiff discussed Ballard's erratic and dangerous behavior with OUR's current president, Matt Osborne, who is a defendant in other filed cases, Osborne acknowledged that everything Plaintiff said was true and said that their [OUR's] role was to prevent Ballard from doing too much damage to himself or others.

72. OUR enticed her to remain by offering her the opportunity to join the Thailand OPS team if she could pass another 4-day training in Salt Lake City.

73. Given that Plaintiff was a trained Marine and a LCSW who wanted to save children from the horrors of being trafficked, she returned with a hope that she could make a difference in Thailand.

74. This training itself was a RUSE also; it was filmed in order to show donors that OUR was a "legitimate" organization.

75. On October 16, 2021, Plaintiff was struck in the face by two untrained operators involved in cosplay training that was not part of any OP strategy.



76. As a result, Plaintiff suffered a catastrophic orbital blow out fracture with impact to her eye muscles, that has resulted in severe double vision and shattered pieces of bone adhering to her facial nerve, that has caused complete numbness of the left half of Plaintiff's face.

77. Ballard was present and refused to call an ambulance because he wanted no record of the event occurring at OUR's training.

78. Plaintiff had surgery to remove the bone fragments from her facial nerve and replaced her eye socket with a silicone and titanium implant to support her eye.

79. Plaintiff still has double vision, swelling, large floaters, and discomfort in her eye that is irreparable.

80. Plaintiff also suffered a closed head injury along with months of headaches, brain fog, and neck soreness.

81. Plaintiff also suffers from PTSD as a result of these physical injuries, and upon learning that Ballard was a liar and fraud, and that her work in attempting to help save children was done so that Ballard could have exotic trips where he could act out the COUPLES RUSE and create a demand for children to be trafficked.

82. It became very evident to Plaintiff that OUR only focused on allowing its celebrity founder, defendant Tim Ballard, to live the lavish lifestyle of a wealthy sex tourist and sexually manipulate and abuse employees, contractors, and volunteers under the guise of saving children by implementing the COUPLES RUSE.

83. OUR's focus to be worshipped as "celebrity heroes" was so intense that it overrode concerns about the safety and welfare of the very operators at the center of OUR's

fundraising.

## FIRST CAUSE OF ACTION
### (SEXUAL ASSAULT AND BATTERY AGAINST DEFENDANT MATT COOPER)

84. Plaintiff incorporates the preceding allegations and the attachments to this complaint, as if fully set forth herein.

85. Defendant Cooper, intentionally, knowingly, or recklessly, committed battery and sexual assault of Plaintiff, as all sexual touching was done under the COUPLES RUSE in order to help save trafficked children and women.

86. As a direct and proximate result of the wrongful conduct of Defendant Cooper, Plaintiff has suffered severe emotional distress, permanent injury, loss of self-esteem and other injuries, all to her general damages in reasonable sums.

87. As a direct and proximate result of the wrongful conduct of Cooper, Plaintiff has incurred and will yet incur medical and therapy expenses, and lost wages all to her special damages in a reasonable sum.

## SECOND CAUSE OF ACTION
### (CONSPIRACY TO COMMIT BATTERY AGAINST DEFENDANTS OUR, BALLARD, and COOPER)

88. Plaintiff incorporates the preceding allegations and the attachments to this complaint, as if fully set forth herein.

89. The COUPLES RUSE was an institutional doctrine of OUR and its affiliated companies and was done with the knowledge of Defendants' management and board members.

90. The Defendants intentionally, knowingly, or recklessly, solicited, instructed, commanded, encouraged and/or intentionally committed battery and sexual assault of the

Plaintiff, all for the sexual gratification of Tim Ballard, using the COUPLES RUSE doctrine fraudulently for sexual gratification and not for any legitimate purpose of OUR.

91. The Defendants conspired and combined together for the purpose of Defendant Cooper being allowed to have sexual relations with the Plaintiff.

92. The object of the conspiracy was illegal and carried out as the result of a calculated plan between the Defendants.

93. There was a meeting of the minds among said Defendants with regard to the COUPLES RUSE and how to allow Cooper to sexually abuse the Plaintiff.

94. As a direct and proximate result of the wrongful conduct of Defendants, Plaintiff has suffered severe physical injury, emotional distress, permanent injury, loss of self-esteem and other injuries, all to her general damages in reasonable sums.

95. As a direct and proximate result of the wrongful conduct of Defendants, Plaintiff has incurred and will yet incur medical and therapy expenses, and lost wages all to her special damages in a reasonable sum.

### THIRD CAUSE OF ACTION
### (FRAUD AGAINST DEFENDANTS BALLARD and COOPER)

96. Plaintiff incorporates the preceding allegations and the attachments to this complaint, as if fully set forth herein.

97. Said Defendants made fraudulent statements and actions based upon the COUPLES RUSE.

98. Said Defendants' actions and statements towards Plaintiff were fraudulent and were done for their sexual gratification and pleasure.

99. Said Defendants made representation(s) about the COUPLES RUSE, who approved it and how it helps in fighting human trafficking, which were false, and said Defendants knew to be false, for the purposes of inducing the Plaintiff into participating or attempting to have her participate, in the COUPLES RUSE, so that Defendants could act out their sexual proclivities.

100. Defendants knew that the Plaintiff would act on their representations in ignorance of their falsity and the Plaintiff did rely upon said representations and was induced to act, all to her injury and damage.

101. As a direct and proximate result of the wrongful conduct and frauds of Defendants, Plaintiff has suffered severe emotional distress, permanent injury, loss of self-esteem and other injuries, all to her general damages in reasonable sums.

102. As a direct and proximate result of the wrongful conduct of said Defendants, Plaintiff has incurred and will yet incur medical and therapy expenses, and lost wages, all to her special damages in a reasonable sum.

### FOURTH CAUSE OF ACTION
### (NEGLIGENCE AGAINST ALL DEFENDANTS)

103. Plaintiff incorporates the preceding allegations and the attachments to this complaint, as if fully set forth herein.

104. The Defendants owed duties of care to Plaintiff that they negligently breached by allowing Plaintiff to be smashed in the face during the filming of a non-directed training session.

105. As a direct and proximate result of the wrongful conduct of Defendants, Plaintiff has suffered severe physical injuries, emotional distress, permanent injury, loss of self-esteem and

other injuries, all to her general damages in reasonable sums.

106. As a direct and proximate result of the wrongful conduct of Defendants, Plaintiff has incurred and will yet incur medical and therapy expenses, and lost wages, all to her special damages in a reasonable sum.

## FIFTH CAUSE OF ACTION
### (PREMISES LIABILITY v. OPERATION UNDERGROUND RAILROAD)

107. Plaintiff incorporates the preceding allegations and the attachments to this complaint, as if fully set forth herein.

108. Plaintiff was a business invitee upon Operation Underground Railroad's premises and was owed duties of care to care for Plaintiff's well-being and safety.

109. Defendant Operation Underground Railroad violated the duties owed to Plaintiff.

110. As a direct and proximate result of the wrongful conduct of Defendant Operation Underground Railroad, Plaintiff has suffered severe physical injuries, emotional distress, permanent injury, loss of self-esteem and other injuries, all to her general damages in reasonable sums.

111. As a direct and proximate result of the wrongful conduct of Defendant Operation Underground Railroad, Plaintiff has incurred and will yet incur medical and therapy expenses, and lost wages, all to their special damages in a reasonable sum.

## SIXTH CAUSE OF ACTION
### (PIERCING THE CORPORATE VEIL AGAINST ALL CORPORATE DEFENDANTS)

112. Plaintiff incorporates the preceding allegations and the attachments to this complaint, as if fully set forth herein.

113. Defendant Tim Ballard and the Corporate Defendants are alter egos of each other.

114. The Corporate Defendants and Defendant Tim Ballard should all be treated as one entity to prevent Defendants from using the corporate fiction as a tool to inflict civil harm upon Plaintiff.

115. The corporate fiction of the Corporate Defendants should be disregarded because they have been used as part of an unfair device to achieve an inequitable result.

116. The corporate structures of the Corporate Defendants should not shield fraud, evasion of existing obligations, circumvention of statute, and the like.

117. As a result, the corporate veil should be pierced to provide that all Corporate Defendants are jointly and severally liable for the damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against Defendants as follows:

1. For general damages in an amount to be proved at trial;

2. For special damages in an amount to be proved at trial;

3. For punitive damages against all defendants in an amount sufficient to punish them and to deter them and others in similar situations from engaging in such conduct in the future; and

4. For such other costs, interest, expenses, attorney's fees, and other relief the Court finds appropriate under the circumstances.

## JURY DEMAND

Pursuant to Rule 38(b) of the Utah Rules of Civil Procedure, Plaintiff hereby demands a trial by jury in this case and submits herewith the applicable fee.

DATED this 20th day of November, 2023.

        **ALL UTAH LAW PLLC**

        */s/ Suzette Rasmussen*
        Suzette Rasmussen

        **GREEN LAW PLLC**

        */s/ Michael K. Green*
        Michael K. Green

        **MORTENSEN & MILNE**

        */s/ Alan W. Mortensen*
        Alan W. Mortensen
        Lance L. Milne
        Christopher J. Cheney
        Joshua S. Ostler

<u>Plaintiff' Address</u>:
c/o MORTENSEN/MILNE
68 South Main Street, Suite 700
Salt Lake City, UT 84101